**Affirmed and Memorandum Opinion filed March 21, 2019**



In The

# Fourteenth Court of Appeals

---

### NO. 14-18-00890-CV

---

### IN THE INTEREST OF A.C.S. AND T.R.L., CHILDREN, Appellant

### V.

### TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, Appellee

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2017-04129J**

---

## M E M O R A N D U M   O P I N I O N

This accelerated appeal arises from a final decree in a suit in which termination of the parent-child relationship was at issue. *See* Tex. Fam. Code Ann. § 109.002(a-1). The children are Amy and Tina. The parents are A.B. (Mother); appellant E.S.T. (Ed), Amy's father; and appellant P.A.L. (Paul), Tina's father.[1] The

---

[1] We use pseudonyms or initials to refer to the children, parents, and other family members involved in this case. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

trial court terminated each parent's rights and appointed the Texas Department of Family and Protective Services (the Department) to be the children's managing conservator.

On appeal, Ed and Paul challenge the sufficiency of the evidence to support termination. Ed also challenges the trial court's appointment of the Department as Amy's managing conservator. We conclude legally and factually sufficient evidence supports the trial court's findings that Ed and Paul endangered their daughters and that termination of their parental rights is in the girls' best interest. Therefore, we affirm the trial court's judgment.

## BACKGROUND

### A.    Removal

The Department received a referral in February 2016 alleging negligent supervision of Amy, then seven and a half, and Tina, then four months, by Mother. Mother was said to be smoking crack and selling food stamps to buy drugs. Neither Ed nor Paul were mentioned in the report. The Department was unable to locate Mother until October 2016. Soon thereafter, the Department confirmed Paul was an inpatient at a state psychiatric hospital. The girls were placed with Mother's brother in a Parental Child Safety Placement (PCSP). The Department made contact with Paul in June 2017. It searched for Ed in July 2017 but did not locate him. In August 2017, Mother left the girls with a daycare worker and disappeared. The Department removed Amy and Tina and filed this suit for protection, conservatorship, and termination on August 15, 2017. Following an adversary hearing, the trial court named the Department as Amy's and Tina's temporary managing conservator. The Department located Ed in November 2017.

**B. Family service plan**

The trial court signed an order requiring Ed and Paul to comply with any family service plan by the Department. The service plan would identify the goals each man needed to achieve and tasks and services he needed to complete before his daughter could be returned to his care.

Ed's service plan first required him to submit to a DNA test to establish paternity. After he was found to be Amy's father, the amended service plan required him to, among other things: complete parenting classes; complete a substance abuse assessment and follow the assessor's recommendations; submit to random drug testing and test negative at all times; refrain from criminal activity; complete a psychosocial evaluation and follow the evaluator's recommendations; complete individual therapy and follow the therapist's recommendations; maintain safe, stable housing for more than six months and provide the caseworker with appropriate documentation; and maintain stable employment and provide the caseworker with appropriate documentation.

Like Ed, Paul first had to undergo DNA testing to determine whether he is Tina's father. Once paternity was established, the requirements of Paul's amended service plan included: refrain from criminal activity and illegal drug and alcohol abuse; maintain safe, stable housing for more than six months and provide the caseworker with appropriate documentation; maintain stable employment for six months and provide the caseworker with appropriate documentation; participate in all hearings, meetings, and conferences; complete parenting classes; complete anger management classes; undergo a psychological and, if necessary, psychiatric evaluation; and complete individual therapy and follow the therapist's recommendations.

3

### C. Trial

#### 1. Evidence about Ed

##### a. Criminal history

The record reflects a nearly 25-year criminal history for Ed. In June 1994, he pleaded guilty to theft and was sentenced to 180 days' confinement. He pleaded guilty in December 2000 to delivery of less than one gram of cocaine and again was sentenced to serve 180 days in jail. In early 2006, a criminal court deferred an adjudication of guilt and placed Ed on community supervision for possession with intent to deliver one to four grams of cocaine. Ed violated the terms of his community supervision, so the court adjudicated his guilt in March 2009 and sentenced him to four years' imprisonment. A year later, Ed was arrested for possession of less than a gram of cocaine. He pleaded guilty to that charge and was sentenced to serve six months in jail. Ed's three convictions for possession of cocaine resulted from his work as a drug dealer, he admitted at trial. Finally, in late 2013, Ed pleaded guilty to evading arrest or detention with a motor vehicle. The court sentenced him to two years' imprisonment.

##### b. Drug use

Ed testified he achieved sobriety from cocaine in December 2002 and from alcohol in February 2017. His alcohol sobriety date is the day he began a residential rehabilitation program, which he successfully completed in August 2017.

Despite his claims of sobriety and no relapses, Ed tested positive by hair follicle for cocaine, benzodiazepines, and marijuana in December 2017, after which the Department referred him for another substance abuse assessment. Ed tested negative for all substances for seven months before again testing positive for cocaine and marijuana in July 2018.

### c. Service plan

Two caseworkers testified Ed completed all the requirements of his service plan except one: by testing positive for cocaine and other illegal substances, he violated the service plan's requirement that he test negative for drugs.

### d. Ability to provide for Amy

Ed testified he had stable housing since early 2017. His nephew owned several rental houses, and Ed rented one of them for his residence. Amy would have her own room in his house. The Court Appointed Special Advocate (CASA) assigned to the case had visited Ed's home and had no concerns.

The record contains a certificate showing Ed was forklift-safety certified. At the time of trial in September 2018, he had been working for almost a year as a forklift operator for a furniture store. Before that, he testified, he worked at another job for more than a year. He said he earned "very good money" at his job at the furniture store—roughly $2,500 to $2,800 per month. Ed testified he sent money to Mother for Amy's benefit while he was working in Iowa. According to caseworker Jessica Leal, despite the trial court's ordering him in March 2018 to pay child support, Ed had not provided the Department with any money for Amy. Health insurance for Ed and Amy was available through his work, and he could purchase furniture at a discount. He had a car.

### e. Relationship with Amy

Ed was in prison for the early part of Amy's life. Still, he considered his relationship with Amy to be good. He testified Amy was healthy, not afraid of him, and wanted to live with him. Mother agreed Ed and Amy were well bonded. She testified Ed and Amy used to go to movies, parks, and restaurants. Ed testified his many visits with Amy were very good. He attended all but one, and the one he

missed was due to a death in his family. Leal testified Ed and Amy were interacting during their visits, and she believed Amy enjoyed them. But caseworker Jasmine Smith observed a visit between Amy and Ed during which Amy "was on her tablet" and Ed "was on his phone." When asked if Amy was happy to see Ed at that visit, Smith responded, "It wasn't any emotions."

The children's attorney ad litem asked Ed why he did not come forward in this case until December 2017. He responded he had been working in Iowa and did not return to Houston until the end of 2016. When he got back, he said, Mother was "with somebody else and made it kind of very difficult for me to see my child. Didn't know where they was half the time." Ed testified he did not know Amy was in Department custody until November 2017, when he was served with process in this case.

At Ed's lawyer's request, the Department completed a "return-home staffing," a process by which the Department determines whether a child may safely be placed with her parent. The Department decided Amy could not be placed with Ed because of his July 2018 positive test result for drugs.

Amy's foster mother testified Amy is "fine" when she visits Ed, but she does not ask about him. If the foster mother reminds Amy of an upcoming visit with Ed, "then she'll be like okay. But as far as anything else, no." The foster mother said Ed called her regularly to check in on Amy.

### 2. Evidence about Paul

#### a. Criminal history

Paul has a long criminal history, much of it plagued by violence. The day after Christmas of 1992, he was arrested for assault. He pleaded guilty and was sentenced to 10 days' confinement. Paul pleaded guilty in 1993 for driving while intoxicated.

6

The court suspended his sentence and placed him on community supervision for one year. Based on his violation of the terms of his community supervision, the court revoked the suspension of his sentence and sentenced him to 180 days' confinement. At the end of 1994, he was convicted of driving with a suspended license and sentenced to serve 10 days in jail. He pleaded guilty to another count of driving with a suspended license in 1995; his sentence for that second offense was 40 days' incarceration. Also in 1995, Paul was charged with theft of property in an amount between $20 and $500. The court deferred an adjudication of guilt and placed him on community supervision for one year.

The record does not reflect any further criminal conduct by Paul until 2004, when he pleaded guilty to criminal mischief and aggravated robbery with a deadly weapon. He was sentenced to serve 60 days in jail for the criminal mischief and seven years in prison for the aggravated robbery. In 2011, Paul pleaded guilty to making a terroristic threat and was sentenced to 100 days' confinement. Paul was arrested in early 2012 for harassing communication. He pleaded guilty and was sentenced to serve 30 days in jail.

Just six weeks later, Paul allegedly committed burglary of a habitation and aggravated assault with a deadly weapon. The court found him not guilty by reason of insanity on each charge and ordered him committed to a maximum-security state mental health facility. The court also found each charge involved dangerous conduct by placing another person in imminent danger of serious bodily injury.

In April 2016, a court again found Paul not guilty by reason of insanity of making a terroristic threat and assault of a family member. Paul testified those judgments stemmed from his New Year's Day assault of Mother. He said he did not remember the details of the assault, only that he "got drunk and blacked out." At least two protective orders requested by Mother have been issued against Paul.

### b. Other violent behavior

The record reflects other instances of violence charged against Paul that did not result in convictions. Department records indicate he swore at caseworker Karen Miller in June 2017, when the Department first contacted Paul about this case. He allegedly told her, "Hell, no, I'm not coming to the CPS office to visit my child." At trial, Leal recounted her testimony from a March 2018 status hearing, during which she said Paul threatened her earlier that day and was "very aggressive." A police officer escorted her from the courtroom because of fear for her safety. Paul also threatened Smith over the phone in August 2018, a month before trial. She described his threat as, "If he didn't get his kids back something would happen."

### c. Drug use

Paul testified he "can't count" how many times he used cocaine since Tina was born, nearly three years before trial, but confirmed it was more than 20. He tested positive by hair follicle in early October 2017 for cocaine, benzodiazepines, and marijuana. He did not appear for a required drug test in December 2017, nor did he remain in the courtroom for a drug test in March 2018; both failures are considered positive results under Department policy. In June 2018 and August 2018, he was negative for all tested substances. However, in July 2018, he again tested positive for cocaine and benzodiazepines.

### d. Service plan

Paul completed the only requirement of his first plan: submit to a DNA test to establish paternity of Tina. Paul testified he never received an amended service plan with additional requirements. The trial judge inspected the case records during trial and took judicial notice that Paul was in the courtroom the day she approved the amended service plan.

Paul did not complete any parenting classes. He showed his caseworker proof of his social security disability income, but he did not show her proof of stable housing. Early in the case, the Department tried to get Paul involved in counseling, domestic violence classes, and therapy. He reportedly was not receptive. The CASA testified he was referred for individual counseling. After failing to appear for counseling for 10 weeks, he was discharged as unsuccessful.

### e.    Relationship with Tina

Paul testified Tina calls him "Daddy." He said he had a good bond with her. According to Leal, Paul visited Tina early in the case, but he stopped because his work was allegedly interfering with his visits. The children's attorney ad litem eventually requested no visits by Mother, Ed, or Paul until they tested negative for drugs. After Paul tested negative, he had perhaps one visit with Tina.

### f.    Ability to provide for Tina

Paul testified he had been supporting Tina even though he had not been ordered to do so. He said he was employed by a construction company and received $790 per month in disability income. He lived with his mother and said it was "possible" she would let Tina live with them.

### 3.    Evidence about the children

Amy and Tina were placed with a fictive kin until late November 2017, at which time the caregiver told the Department she could no longer care for the girls. The Department then placed them in a foster-to-adopt home, where they remained through the time of trial. The foster mother wanted to adopt both girls. Both Leal and the CASA testified it is in the best interest of both sisters for the girls to remain together.

### a. Amy

At the beginning of the case, Amy was struggling in school. Her foster mother testified Amy received Ds and Fs. She greatly improved in the 10 months she lived with her foster mother, bringing her grades up to mostly As and Bs. Amy was reportedly proud to have been promoted from third to fourth grade a few months before trial.

Amy's emotional health improved as well. Leal testified Amy used to act as Tina's parent rather than her sister. Through therapy, Leal said, Amy was able to assume an age-appropriate role. The foster mother said Amy had made "huge strides" during their time together. She was said to enjoy her friends and the activities she, Tina, and her foster family did together. Amy was current on her medical and dental treatment and was seeing a therapist. The CASA recommended Amy continue therapy.

Amy told her foster mother that Mother left her, Tina, and two young cousins alone in the house for a couple of days. Another time, she said, they went to a house where people came in and out but she did not know what they were doing. Mother had put her in a room to watch television.

About a month before trial, Amy made an outcry of sexual abuse to her foster mother. She said Mother's boyfriend (not Ed or Paul) penetrated her with his penis and his fingers while Mother and Tina were asleep in the room. A forensic interview was scheduled to be conducted soon after trial.

The foster mother testified about an instance of sexualized behavior by Amy. Amy and the foster mother's godson were playing video games in the foster home when another adult discovered "the little boy on top of [Amy]." Ed, however, testified the foster mother told him Amy had been discovered "humping" the boy. Ed said he called the caseworker about the incident, who "blew it off as if it was

really not a big ordeal [sic] and I was very upset about it."

Due to the incident with Amy and the godson, Ed did not want Amy to stay with the foster mother. He wanted Amy to be placed with either his brother in North Carolina or his nephew in San Antonio. Ed and Mother both testified Amy knew her family in North Carolina and had visited a few times. Ed's brother, who did not appear at trial, was willing to take Amy only, which would mean separating Amy and Tina. Ed's nephew appeared at trial for moral support of Ed, the nephew testified. He had been under the impression Ed was supposed to get Amy back a few months earlier. He testified he would take Amy but would need to talk to his wife about taking Tina.

### b. Tina

Tina had just turned a year old when she was placed with the foster mother. She was not talking at all at that time, and arrangements were made for an Early Childhood Intervention (ECI) evaluation. Ten months later, Tina was said to "hold full conversations." ECI reportedly declined to offer services because Tina was speaking and developmentally on target.

According to the CASA report, the foster mother described Tina as "extremely smart" and emotionally attached to her. The CASA wrote Tina appeared to be "thriving, healthy, and in good spirits." She was potty trained and current on all medical and dental treatment. She had no special needs. Tina's daycare providers reported she was "loving, smart, and a pleasure to be around." They said she engages well with other children and was responsive and progressive in her development.

### 4. Trial court's findings

The trial court found Mother, Ed, and Paul engaged in the conduct described in subsections D, E, and O of section 161.001(b)(1) of the Family Code. The court

additionally found termination of each parent's rights was in Amy's and Tina's best interest. The trial court appointed the Department to be the girls' managing conservator. Ed and Paul timely appealed.

**ANALYSIS**

## I.    Burden of proof and standards of review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re J.E.M.M.*, 532 S.W.3d 874, 879 (Tex. App.—Houston [14th Dist.] 2017, no pet.). However, the child's emotional and physical interests must not be sacrificed to preserve parental rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Parental rights may be terminated if clear and convincing evidence shows (1) the parent committed an act described in section 161.001(b)(1) of the Family Code, and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2). Only one predicate finding under section 161.001(b)(1), along with the best-interest determination, is necessary to support termination. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007. This high burden reflects the severity of termination.

The heightened burden of proof results in heightened standards of review for evidentiary sufficiency:

- *Legal sufficiency.* We consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could disbelieve. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

12

- *Factual sufficiency.* We consider and weigh all the evidence, including disputed or conflicting evidence, to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We consider whether disputed evidence is such that a reasonable fact finder could not have resolved that dispute in favor of its finding. *C.H.*, 89 S.W.3d at 25.

The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam). We may not second-guess the fact finder's resolution of a factual dispute by relying on disputed evidence or evidence the fact finder "could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

## II. Predicate ground for termination: Endangerment (161.001(b)(1)(E))

Ed and Paul challenge the sufficiency of the evidence to support the trial court's findings under subsections D, E, and O of section 161.001(b)(1) of the Family Code. We conclude the evidence is legally and factually sufficient to support the finding of endangerment under subsection E. Accordingly, we do not review the findings regarding subsections D and O. *See A.V.*, 113 S.W.3d at 362.

### A. Legal standards

Family Code section 161.001(b)(1)(E) requires clear and convincing evidence the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "Conduct" includes acts and failures to act. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

A finding of endangerment requires evidence the endangerment resulted from

the parent's conduct, including acts, omissions, or failures to act. *S.R.*, 452 S.W.3d at 360. Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* at 361. A court properly may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury. Rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.L.H.*, 515 S.W.3d 60, 92 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

A parent's criminal conduct and imprisonment are relevant to the question of whether the parent engaged in a course of conduct that endangered the well-being of the child. *S.R.*, 452 S.W.3d at 360–61; *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.—El Paso 2012, no pet.). Imprisonment alone is not an endangering course of conduct but is a fact properly considered on the endangerment issue. *Boyd*, 727 S.W.2d at 533–34. Routinely subjecting a child to the probability he will be left alone because his parent is in jail endangers the child's physical and emotional well-being. *S.M.*, 389 S.W.3d at 492.

A parent's continuing substance abuse can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). A parent's drug use exposes the child to the

possibility the parent may be impaired or imprisoned and, thus, unable to take care of the child. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The fact finder may give "great weight" to the "significant factor" of drug-related conduct. *L.G.R.*, 498 S.W.3d at 204.

## B. Ed

Ed challenges only the factual sufficiency of the evidence to support the trial court's finding under subsection E.

Ed has a lengthy albeit sporadic criminal history. Most of his convictions are for possession and/or delivery of cocaine. He admitted he previously worked as a drug dealer, a lifestyle he acknowledged is dangerous for a child. Despite his claims of sobriety, he twice tested positive for cocaine, benzodiazepines, and marijuana during the pendency of this case, the second just two months before trial. Ed agreed the tests were positive but insisted he did not use cocaine. The trial court was free to discredit his self-serving testimony. *See H.R.M.*, 209 S.W.3d at 109 (fact finder is sole arbiter when assessing credibility and demeanor of witnesses). A parent's unwillingness to admit he has a substance abuse problem suggests he will continue to abuse drugs and therefore continue to endanger his child. *See In re A.J.E.M.-B.*, Nos. 14-14-00424-CV, 14-14-00444-CV, 2014 WL 5795484, at *5 (Tex. App.—Houston [14th Dist.] Nov. 6, 2014, no pet.) (mem. op.) (considering evidence that parents "minimized concerns and were in denial of the impact that substance use has on their ability to sufficiently be in tune to the needs of their child."); *In re E.H.*, No. 02-09-00134-CV, 2010 WL 520774, at *4–*5 (Tex. App.—Fort Worth Feb. 11, 2010, no pet.) (mem. op.) (considering father's denial that his drug use and drug dealing harmed his children as factor in endangerment analysis).

In light of the entire record, we conclude the disputed evidence the trial court

could not reasonably have credited in favor of its endangerment finding is not so significant that the court could not reasonably have formed a firm belief or conviction that Ed endangered Amy. Accordingly, the evidence is factually sufficient to support the trial court's finding as to Ed's physical and emotional endangerment of Amy under subsection E. We overrule Ed's first and second issues.

## C. Paul

Paul challenges the legal and factual sufficiency of the evidence to support the trial court's finding of endangerment under subsection E.

"Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *accord S.R.*, 452 S.W.3d at 361. The record reflects many acts of violence by Paul. He has been convicted of assault, terroristic threats, and harassing communication. In 2012, he was found not guilty by reason of insanity of burglary of a habitation and aggravated robbery with a deadly weapon. And in 2016, when Tina just six weeks old, Paul allegedly assaulted Mother after he "got drunk and blacked out." A judgment of not guilty by reason of insanity does not mean he did not commit those acts, only that he cannot be held criminally responsible for them. *See Pesch v. State*, 524 S.W.2d 299, 301 (Tex. Crim. App. 1975) ("Insanity is a defense that excuses a defendant from punishment because of his state of mind at the time of the commission of the act. . . . It does not mean that the conduct (if the accused is sane) does not constitute an offense."). Paul swore at the first caseworker assigned to this case, threatened the second to the extent she required a police escort from court, and ominously told the third "something would happen" if he did not get Tina back.

Paul also has a long history of substance abuse. He testified he could not count the number of times he had used cocaine since Tina was born.

Considering all the evidence in the light most favorable to the endangerment finding, we conclude the trial court reasonably could have formed a firm belief or conviction that Paul engaged in conduct described in subsection E. Further, in light of the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its endangerment finding is not so significant that the court could not reasonably have formed a firm belief or conviction that Paul endangered Tina. Accordingly, the evidence is legally and factually sufficient to support the trial court's finding as to Paul regarding subsection E. We overrule Paul's first and second issues.

## III.    Best interest

Ed and Paul both challenge the legal and factual sufficiency of the evidence to support the trial court's finding that termination of parental rights is in his respective daughter's best interest.

### A.    Legal standards

Termination must be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(2). Texas courts presume two conditions to be in a child's best interest: (1) prompt, permanent placement in a safe environment, *id.* § 263.307(a); and (2) remaining with the child's natural parent. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The best-interest analysis focuses on the child, not the parent. *In re K-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.).

Courts may consider these non-exclusive factors, known as the *Holley* factors, in its best-interest analysis: the desires of the child; the physical and emotional needs of the child now and in the future; the physical and emotional danger to the child now and in the future; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best

interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This list of factors is not exhaustive, and evidence is not required on all the factors to support a finding that termination is in the child's best interest. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The Family Code also identifies factors the court may consider in evaluating a parent's willingness and ability to provide the child with a safe environment. Tex. Fam. Code Ann. § 263.307(b). Finally, evidence supporting the statutory predicate of termination is relevant to the best-interest analysis. *S.R.*, 452 S.W.3d at 366.

## B.    Ed

### 1.    Amy's desires and needs

There is no direct evidence of Amy's desires. Her foster mother and the CASA testified Amy enjoys activities with her foster family. Her grades improved dramatically after moving in with her foster mother. She sees a therapist weekly, but otherwise has no special needs.

### 2.    Stability of proposed placement

Both the Department and the CASA believed it is in Amy's best interest to remain in her foster home so (1) she can be with her sister, and (2) she can have permanency by being adopted. Ed did not want her to stay in the foster home due to the sexualized behavior between Amy and the foster mother's godson. He wanted Amy to be placed with his brother in North Carolina or his nephew in San Antonio. The brother was willing to take only Amy. The nephew was willing to take Amy and said he would have to talk with his wife about taking Tina.

### 3.    Predicate ground of endangerment

Evidence supporting termination under the grounds listed in section 161.001(b)(1) can be considered in support of a finding that termination is in the children's best interest. *See C.H.*, 89 S.W.3d at 27 (holding the same evidence may be probative of both section 161.001(b)(1) grounds and best interest). Accordingly, the evidence of Ed's endangerment of Amy, discussed above, is relevant to the best-interest analysis.

### 4.    Service plan

Ed completed his service plan in all respects except one: he tested positive for drugs.

### 5.    Willingness and ability to parent

The evidence suggests Ed would be financially able to take care of Amy and could provide an appropriate home for her. He could obtain health insurance for her. Ed attended nearly all his visits with Amy and regularly called the foster mother to check on Amy's status, implying he wanted to be involved in Amy's life.

### 6.    Programs available

There is no evidence regarding programs available to assist Ed in parenting Amy.

### 7.    Acts or omissions and any excuses for them

Ed missed one visit with Amy due to a death in his family. He offered no excuse for his drug use during the pendency of this case. To the contrary, he denied drug use and suggested the positive test results were wrong.

### C. Paul

#### 1. Tina's desires and needs

When a child is too young to express her desires, the fact finder may consider that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with a parent. *L.G.R.*, 498 S.W.3d at 205; *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Tina was only four months old when the Department became involved in her life. The record suggests Paul resided in a psychiatric facility when she was born and for the first 18 months of her life. He did not live with her at any time after he appeared in this case. Nearly three years old at the time of trial, Tina was thriving and well-bonded with the foster mother.

#### 2. Stability of proposed placement

The Department and the CASA believed it was in Tina's best interest to remain in the foster home so she may stay with her older sister and be adopted. Paul, who lived with his mother, said it was "possible" his mother would allow Tina to live with them.

#### 3. Predicate ground of endangerment

The evidence of Paul's endangerment of Tina, discussed above, is relevant to the best-interest analysis. *See C.H.*, 89 S.W.3d at 27.

#### 4. Service plan

Paul completed very little of his service plan. He did not finish his parenting classes, and the record suggests he never began individual counseling.

#### 5. Willingness and ability to parent

Though Paul said he had a good bond with Tina, he visited her only two or three times during the pendency of this case. Both the Department and the CASA

worried about his parenting abilities given his history of aggression and violence.

### 6. Programs available

There is no evidence regarding programs available to assist Paul in parenting Tina.

### 7. Acts or omissions and any excuses for them

Early in the case, Paul said his work obligations prevented him from visiting Tina, but he did not explain why he continued to miss visits with Tina. He offered no excuse for his continuing drug use, violent and aggressive behavior, or failure to complete his service plan.

### D. Conclusion

Considering all the evidence in the light most favorable to the best-interest finding, we conclude the trial court reasonably could have formed a firm belief or conviction that termination of Ed's and Paul's parental rights was in the best interest of Amy and Tina, respectively. *See J.O.A.*, 283 S.W.3d at 344; *J.F.C.*, 96 S.W.3d at 266; *C.H.*, 89 S.W.3d at 25. Further, in light of the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its best-interest finding is not so significant that the court could not reasonably have formed a firm belief or conviction that termination of each man's rights was in his daughter's best interest. Accordingly, the evidence is legally and factually sufficient to support the trial court's finding that termination is in Amy's and Tina's best interest. We overrule Ed's and Paul's third issue.

## IV. Managing conservatorship

In his fourth issue, Ed contends the trial court abused its discretion in appointing the Department to be Amy's managing conservator. His brief makes clear this contention depends on our disposition of the trial court's termination of his

parental rights. He writes, "If the Court reverses the judgment terminating [Ed's] parental rights, he requests it also review the appointment of [the Department] as [Amy's] managing conservator." He then acknowledges: "If the judgment terminating [Ed's] parental rights is affirmed then §161.206(b) mandates that [the Department] be appointed as [Amy's] managing conservator. *In re L.G.R.*, 498 S.W.3d 195, 207 (Tex. App.—Houston [14th Dist.] 2016, pet. denied)."

Because we are affirming termination of Ed's parental rights, we overrule his fourth issue.

## CONCLUSION

We affirm the trial court's judgment.

/s/    Tracy Christopher
        Justice

Panel consists of Justices Christopher, Hassan, and Poissant.